Filed 6/24/22  P. v. Mandujano CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL MANDUJANO,<br><br>    Defendant and Appellant. | F078243<br><br>(Super. Ct. No. MCR055511)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Respondent.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Peter H. Smith, and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Rafael Mandujano was found guilty in count 1 of oral copulation and/or digital penetration of a child 10 years of age or under (Pen. Code,[1] § 288.7, subd. (b)), in count 2 of a lewd and lascivious act by force upon a child under the age of 14 years (§ 288, subd. (b)(1)), and in count 3 of misdemeanor resisting arrest (§ 148, subd. (a)(1)). The trial court sentenced Mandujano on count 1 to a term of 15 years to life in state prison. On count 2, the court imposed and stayed the aggravated term of 10 years and, on count 3, imposed a term of 364 days with credit for time served.

On appeal, Mandujano contends that the trial court prejudicially erred when it denied the defense motion to disqualify the young victim, claiming she was incapable of understanding the truth and/or the duty of a witness to tell the truth. He also contends that the trial court erred when it made instructional errors on flight and resisting arrest. We affirm.

## STATEMENT OF THE FACTS

Mandujano and his wife, D.O., have two children; Y.C. has three children. Y.C. testified that she was friends with Mandujano and his wife. Y.C. worked with D.O. and spent time at D.O.'s house.

On January 1, 2017, D.O. invited Y.C. to her home for a meal. Y.C. brought her then four-and-a-half year-old daughter, L.J., and then seven-year-old son, M.C. with her. At D.O.'s, Y.C. helped D.O. make tacos, but the two returned to Y.C.'s house five minutes away to pick up salsa, leaving M.C. and L.J. outside to play with D.O.'s son, G.M. Mandujano was inside in his room.

When D.O. and Y.C. returned less than 10 minutes later, L.J. was in the kitchen, quietly looking down. Since L.J. was usually smiling, Y.C. asked her what was wrong. D.O.'s other son, R.M., said that L.J. was angry. Y.C. gave L.J. her cell phone to play

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

2.

with. According to Y.C., D.O.'s house had a bedroom off the kitchen with a fish tank in it.

Following the meal, Y.C. helped D.O. bake bread. As they did, Y.C. noticed that every time Mandujano passed L.J. he stared at her. This concerned Y.C. enough that she had D.O. take her and her children home. Once home, L.J. went straight to the bathroom. When she was done, Y.C. asked her what was going on. At first, L.J. did not want to say, because she was scared. Encouraged to tell the truth, L.J. told her mother that Mandujano had put his hand inside her.

Y.C. spoke to a friend, who told her to go to the police. Instead, Y.C. took L.J. to Valley Children's Hospital. After being examined there, Y.C. and her husband followed "some sheriffs" to a second hospital for an additional examination.

L.J. testified with the assistance of a Spanish interpreter. She did not know her birthdate, but said she was six years old, in the second grade, and knew her teacher's name. She understood that telling a lie was not good.

According to L.J., when she was four years old, her mother took her and her brother to visit a friend, G.M. While they were there, her mother left. Her brother and G.M. played soccer outside, and she went inside to see the "fish." When she did, G.M.'s father, Mandujano,[2] asked her to get on the bed, "and then he touched my little – my little thing." There was nobody else in the house at the time. When she got onto the bed, she had all of her clothes on, and Mandujano, who was standing next to the bed, put his "whole hand" under her clothing and inside of her. L.J. testified that, when Mandujano took his hand out, she was scared and it hurt. She then went outside to find her mother. She did not feel good and her mother took her home.

---

[2] L.J. did not identify Mandujano in court, but identified a photograph of him as being G.M.'s father.

3.

L.J. testified that she used her "thing" to go both "pee" and "poop" and after Mandujano touched her, it hurt to do both. Later that night, she told her mother what had happened.

M.C. testified that, on the day in question, he was playing soccer with his friend, G.M., outside and L.J. went inside the house. They were going to eat tacos together. After the incident, M.C. told Sheriff's Detective Gutierrez that he was playing with G.M. outside with a ball and L.J. wanted to watch television. G.M.'s dad was in the kitchen.

Dr. Myra Wong, a pediatric emergency physician, performed a genital urinary examination on L.J. at the hospital on January 1, 2017. Dr. Wong found erythema (redness) and a mucosal tear around L.J.'s vaginal area. Dr. Wong opined that the redness could have been caused by skin-to-skin contact and the mucosal tear by a hard enough fingernail scratch. Dr. Wong considered the findings suspicious and referred the matter to social services.

In the early morning of January 2, 2017, L.J. was examined at the Fresno SART Center by forensic nurse specialist Linda Khamsone. Khamsone found redness on L.J.'s labia majora and between the vaginal opening and anal area (perineum). Khansome collected L.J.'s pants and underwear and took swabs from her vulva, vestibule, and anal area, for DNA analysis. Khamsone considered the redness on the labia majora to be normal, subject to lab results, as redness in children that age happened for many reasons.

On January 5, 2017, Investigator Josefina Roderick conducted an interview with L.J. in Spanish. The interview was videotaped and played for the jury. During the interview, L.J. stated that G.M.'s dad touched her and put his hand in her "cola" after saying they were going to play. But "[h]e told lies" and put his hand in her "little thing" while she was sitting on the bed watching television. Her mother was at the store at the time. When Mandujano touched her, "[s]ome water came out." Although Mandujano told her not to talk to anyone about it, she told her mother.

4.

Detective Gutierrez set up two pretext telephone calls between Y.C. and Mandujano. Mandujano did not admit to committing any sexual misconduct during these calls.

On the evening of January 5, 2017, Detective Gutierrez and three plainclothes police officers went to Mandujano's home to arrest him. When Gutierrez knocked on the door, Mandujano came outside and a scuffle ensued as Mandujano resisted arrest.[3] During Mandujano's struggle, D.O. and the children appeared. An ambulance was called for D.O., who was breathing heavily.

A sample of Mandujano's DNA was collected and matched sperm found on L.J.'s vestibule, vulva, and anal swabs and panties. The results for L.J.'s vulva swab showed a sperm mixture "of at least two people."

### Defense

D.O. testified to the events of January 1, 2017, stating she and Y.C. had known each other for five years and socialized on many occasions. She picked Y.C. and her children up that evening and drove them to her house, before returning to Y.C.'s house briefly to pick up salsa. They were gone for about 10 minutes. When they left, Mandujano was in the bathroom, G.M. and M.C. were playing outside and L.J. was in D.O.'s bedroom. According to D.O., L.J. was upset with her mother before they left to pick up the salsa because her mother would not let her play with her cell phone. D.O. also testified that Y.C. had told her that L.J. had been abused by a family member when she was two years old, but had not reported it to the police. She also testified that Y.C. occasionally washed her family's laundry at D.O.'s place in the three months prior to January 1, 2017.

Mandujano testified in his own behalf that, when D.O. and Y.C. left to go get the salsa, he was in the bathroom. G.M. and M.C. were playing on the porch and L.J. was in

---

[3] Additional facts surrounding Mandujano's arrest are addressed in part 2, below.

5.

the bedroom watching television. When he asked L.J. what she was doing, she appeared frightened. When Mandujano told her to go out and play, she walked out of the bedroom with her hands under her clothing in "her intimate part." Mandujano told her to take her hands out of there and put them at her side. L.J. then went into the kitchen.

When asked how his DNA was found on L.J.'s body and clothing, he explained that he had masturbated and ejaculated while in the bathroom, and had not washed his hands before coming out. When he found L.J. in the bedroom, he touched her hands when she put them at her side. He had also put his hand on L.J.'s pants on the upper thigh to see if she had "peed" in her pants. Mandujano denied putting his finger or penis in L.J.'s vagina or anus; denied touching her bare skin or any part of her groin area; and said he did not ejaculate on her or touch her inappropriately.

Mandujano testified that, when law enforcement arrived at his house, he did not resist and never went outside his house. When he opened the door for the officer, he was in the doorway with his hands on the door and doorframe. The officer then tried to grab him, and another person grabbed his arm and pulled him outside.

Mandujano testified that he was interviewed by Detective Gutierrez after he was arrested and told him he had not touched L.J. He did not remember telling the detective that he had seen L.J. "scratching herself a lot down there, and that she had put her hand in there."

Nurse Practitioner Connie Harris testified that she reviewed the sexual exam report on behalf of the defense and agreed with the conclusions that L.J.'s redness could have been caused by a number of things: failure to wipe after urination or defecation, wiping from back to front, using a bubble bath that can act as an irritant, poor hygiene, or trauma. The exam report had noted that L.J.'s clothing was dirty.

### Rebuttal

Officer Hernandez transported Mandujano to jail after his arrest. Enroute, Hernandez asked Mandujano if L.J. was with them that moment, would Mandujano

6.

apologize for what he had done or ask her why she lied about the abuse allegations. After a pause, Mandujano stated that he did not know what he would say. Hernandez stated that he would be upset if someone made a false accusation against him. Mandujano then said L.J. was looking at the fish tank and scratching her groin area. Mandujano asked her if she had peed on herself, and he checked her by touching her groin area above her clothing.

Detective Gutierrez interviewed Mandujano on January 5, 2017, which was recorded and played for the jury. During the interview, Mandujano said he did not touch L.J. and did not know why she was lying. He said he would only touch children on the hands, shoulder, or head. Mandujano said he had heard from Y.C. that L.J. had been scratching herself "down there and sticking her little hand." On the day of the incident, L.J. wanted to see the fish. When she came out of the room, she was scratching herself. Mandujano did not help her but asked her if she had to pee. When he did, he touched her on the inner thigh. Mandujano denied sticking his fingers in her vagina. As for his DNA being on L.J., Mandujano could only say that, after he greeted her by the hand, she may have scratched herself. Mandujano did not say he had masturbated the day of the incident.

## DISCUSSION

### I.     Denial of Defense Motion to Disqualify the Victim Witness

Mandujano contends that the trial court prejudicially erred when it denied his motion to disqualify L.J. as an incompetent witness. We disagree.

*Applicable Law*

> "When a witness's competency to testify ... is questioned, we start from the general rule that '[e]xcept as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' (Evid. Code, § 700.) A person is completely disqualified from testifying under Evidence Code section 701, subdivision (a) if he or she is '(1) [i]ncapable of expressing himself or herself concerning the matter so as to be understood ... or [¶] (2) [i]ncapable of understanding the duty of a witness to tell the truth.' 'Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of

7.

proof is on the party who objects to the proffered witness, and a trial court's
determination will be upheld in the absence of a clear abuse of discretion.' "
(*People v. Flinner* (2020) 10 Cal.5th 686, 740.)

"A trial court abuses its judicial discretion when it renders a ruling that is absurd or
beyond the bounds of reason, all of the circumstances considered." (*In re Ana C.* (2012)
204 Cal.App.4th 1317, 1326 (*Ana C.*).)

Mandujano contends the trial court abused its discretion by denying his motion to
disqualify L.J. as a witness because she was incapable of understanding the truth and/or
the duty of a witness to tell the truth. Because "[t]he issue of a witness's competence
largely involves an evaluation and weighing of the evidence concerning the issue" (*Ana
C., supra,* 204 Cal.App.4th at p. 1325), we review in detail L.J.'s testimony at the hearing
on the motion.

### *Background*

Prior to trial, Mandujano challenged L.J.'s competency to testify as a witness and
moved to disqualify her. At an evidentiary hearing, L.J. testified that she was six years
old but did not know her birthdate. She said her last birthday celebration was good and
"tiny" and she ate cake.

L.J. spoke both English and Spanish during the hearing and was assisted by a
Spanish interpreter. L.J. testified that she spoke Spanish a lot, but did not know which
language she spoke first. She understood Spanish a little better than English. She
admitted to being nervous during the hearing.

When asked if she knew the difference between the truth and a lie, L.J. said no.
When asked, "Is it good to tell the truth?" she said no. When asked if it was bad to tell a
lie, she said "Yes." And when asked why, she said, "Because it's not good."

L.J. was wearing a pink dress, and when asked by the prosecutor whether he was
telling the truth or a lie if he told her her dress was black, she said "Lying." L.J. said lying
was not good and she gets into trouble for telling lies. If she told her mother a lie, she

would get mad and punish L.J. by sending her to her room. L.J. further agreed that telling lies gets people in trouble and it is not good to tell lies.

L.J. testified that she went to Sunday school and her Sunday school teacher told her that telling lies are not good and her teacher would not be happy if she told a lie. She initially said that her Sunday school teacher said telling the truth was not good, but then stated, "Because that's not good in lying all the time."

L.J. did not know what the word "honest" meant. She was in the first grade and did not know her teacher's name, "[b]ecause it's now another one" when she returned to school. She said her teacher talks about telling the truth and "[t]hat's it's not good." But she also said her teacher talked about telling lies and that "it's not good for everyone." L.J. had a friend tell a lie and the teacher said it was not good.

L.J. stated that the word "truth" meant "that's not good" and that she did not know what the word "lie" meant. When the prosecutor asked if he told her that she was 25 years old, L.J. said, "No. [¶] I am six."

L.J. testified that she had a "bigger" brother M.C.; her mother's name was [Y.C.]; and she struggled with her father's name but called him "Papa." L.J. said that she did not have a sister Janet and that the prosecutor would be lying if he said she did.

L.J. also said she did not know what the Spanish word "lie" meant, but when asked by the court what truth and lie means, she said, "Say the whole truth."

L.J. did not understand the prosecutor's question that, if he was to tell her that the truth meant something that actually happened, would she agree to tell only what happened when questioned. The court then asked L.J. if she promised to tell the truth, and she said yes. The court also asked L.J. if his tie was red, and she correctly said yes. When the court asked her if she would ever say that his tie was blue, she said no. She also said she would not say the tie was blue if someone told her to say it was blue.

Defense counsel, who was wearing a dark black jacket, asked L.J. if someone said his jacket was white, would that be the truth. L.J. said no.

The trial court also asked L.J. if she knew the court's tie was red, but she accidentally said it was blue, would she be able to say she meant red. She said yes.

Defense counsel argued that L.J. was incompetent to testify because she did not understand the difference between telling the truth and telling a lie. Counsel argued that he was not sure L.J.'s responses to the questions were accurate even half the time, and that it was hard to determine whether she understood the importance of the truth.

The trial court denied the motion and, in explaining its reasoning, stated that "overall" her testimony was that she was going to tell the truth. The court found the phrasing on some of the questions asked led to some confusion, but that, even though she was "very nervous" and "very young" she "definitely understands the truth, what the truth is," and "definitely understands that she's supposed to tell the truth." The court stated that, "as far as competency, I think she's competent to testify. I think the rest will be for the jury to determine. So I'm going to rule that she's at least competent to testify."

At trial, L.J. promised to tell the truth. During her testimony, she stated that it was good to tell the truth and not good to lie because people do not like it and you can get into trouble if you lie. She also said her mother would yell at her is she told a lie.

*Analysis*

Mandujano asserts there was unsubstantial evidence to support the finding that L.J. understood truth from falsity and/or that she was capable of understanding her duty as a witness to tell the truth, pursuant to Evidence Code section 701, subdivision (a)(2). We conclude the trial court was within its discretion in permitting L.J. to testify.

The record does not support Mandujano's contention that L.J. did not understand truth from falsity or that she was incapable of understanding her duty to tell the truth. Admittedly, she had difficulty with some questions that were abstract or complex, but she was able to answer the questions asked of her about her age, school, and her family. An abstract understanding of the meaning of the words "truth" and "lie" is not required for a witness to testify. (See § 701, subd. (a)(2); *Ana C., supra,* 204 Cal.App.4th at pp. 1326-

10.

1329 [no abuse of discretion when juvenile court found competent a moderately mentally disabled 14 year old, who demonstrated her understanding of the duty to tell the truth despite answering "no" when asked if she knew what it meant to tell the truth or if it was wrong to tell a lie].)

At the evidentiary hearing, L.J. demonstrated that she understood her duty to tell the truth when the prosecutor asked L.J., who was wearing a pink dress, if he was telling the truth or a lie if he told her that her dress was black, and she answered "[l]ying." She answered a similar question correctly when the trial court asked her about his red tie. She also stated that she would not say the court's tie was blue if someone told her to say it was blue. When asked, she also told the court that she promised to tell the truth and testified that she would get into trouble with her mother if she told a lie, and that lies were not good and get people into trouble. The trial court had the opportunity to observe L.J. and her demeanor in responding to the questions. No abuse of discretion appears here. (See *People v. Mincey* (1992) 2 Cal.4th 408, 443-445 [concluding trial court did not abuse discretion in ruling five-year-old competent to testify after ascertaining she could distinguish between truth and falsity].)

We conclude the trial court did not abuse its discretion in denying defense counsel's motion to disqualify L.J. as a witness and letting the jury evaluate her credibility. Accordingly, we reject Mandujano's contention.

## II.     Claims of Instructional Error

Mandujano claims the trial court made several prejudicial instructional errors having to do with his arrest. We will address each issue separately, but first chronicle the details of his arrest.

### *Background*

Close to 8:00 p.m. on January 5, 2017, Detective Gutierrez and three other officers, Miguel Hernandez, Richard Gonzalez, and Mark Adams, went to Mandujano's home to arrest him. The four arrived in unmarked patrol vehicles.

11.

Detective Gutierrez approached Mandujano's house and knocked on the front door. Officers Hernandez and Adams stood against the wall to the left of the door and Officer Gonzalez was in the back of the residence to prevent an escape. Mandujano answered the front door and stepped "completely" outside the door. Gutierrez told Mandujano that a "lady" had made criminal allegations against him and that he needed to come with him. When Gutierrez reached for Mandujano's hand to place him under arrest, Mandujano pulled away and tried to run back into the house. As he did so, Adams grabbed a hold of Mandujano's arm and then his shirt. Mandujano's momentum carried Gutierrez, Adams and Hernandez just inside the doorway of the home.

Mandujano clenched his fist and Officer Hernandez, concerned that Mandujano would assault one of the officers, struck Mandujano on the left side of his face. Hernandez and Officer Adams wrestled with Mandujano on the ground. Both officers ordered Mandujano multiple times to "show" his hands as Mandujano pulled them away to his chest. Hernandez struck Mandujano a second time on the left side to gain control of him. Hernandez was then able to flip Mandujano over onto his stomach and handcuff his hands behind his back.

Officer Adams testified that he grabbed Mandujano's right arm and held his shirt as Mandujano attempted to go back into the residence. He eventually handcuffed him.

Officer Hernandez testified that Detective Gutierrez, after questioning Mandujano and telling him why they were there, grabbed Mandujano by the arm and Mandujano pulled back and tried to get back into the house. Inside the residence, Officer Adams grabbed Mandujano by the arms. Mandujano clenched his fist and Officer Hernandez struck Mandujano, at least once, on the left side of his face. Mandujano ended up on his back. Hernandez held one arm, grabbed control of Mandujano's arms to flip him over, struck Mandujano on the left side of his body to gain control without effect, struck him a second time, got him onto this stomach, controlled his arm, and eventually handcuffed him.

12.

D.O. and the children appeared during the struggle.  D.O. fainted and needed an ambulance.

At trial, Mandujano testified that he did not try to resist arrest, that he was inside the house and never went outside.  Mandujano described his position when answering the door as having one hand on the door and one on the doorframe.  According to Mandujano, the officer introduced himself, stepped forward, and tried to grab him by the chest to pull him outward.  Mandujano did not know another person was hidden on the side of the door.  Officers then grabbed his arm and pulled him outside.  He felt two blows in the face and landed on his knees inside the house.  Mandujano again said he did not try to resist.

***Flight Instruction***

Mandujano first contends that the trial court erred prejudicially when it gave instructions on flight as consciousness of guilt as it lacked evidentiary support.  We disagree.

At trial, defense counsel objected to the trial judge's proposed CALCRIM No. 372 flight instruction.  The trial court overruled the objection, stating there was "sufficient evidence for the jury to decide and put whatever weight they want on that."  The jury was subsequently instructed as follows:

> "If the defendant fled or tried to flee after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

" ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.]  Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' "  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

We review de novo the trial court's decision to instruct on flight.  (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

13.

Mandujano argues the evidence did not support an inference of flight. This assertion ignores a reasonable inference from the evidence that, immediately after Detective Gutierrez made contact with Mandujano, held up his badge to tell him accusations had been made against him, and that he needed to come with the detective, Mandujano attempted to flee when he pulled away from Detective Gutierrez and ran back into the house. This evidence was sufficient to warrant the flight instruction.

### Resisting Arrest Instructions

Mandujano contends that the trial court erred prejudicially by failing to properly instruct on the charge of resisting a peace officer as alleged in count 3. We find no prejudicial error.

Again, we review a claim of instructional error independently. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) A trial court is required to instruct on general principles of law that are applicable to the facts shown by the evidence and that are necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Because the prosecution has the burden of proving beyond a reasonable doubt each element of a charged offense, an instructional error which relieves the prosecution of its burden violates the defendant's constitutional right to due process. (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.) Further, a trial court must instruct on defenses that are consistent with the evidence. (*People v. Montoya, supra,* 7 Cal.4th at p. 1047.)

The trial court instructed, pursuant to CALCRIM No. 2656, as follows:

> "The defendant is charged in Count 3 with resisting or delaying a peace officer in the performance or attempted performance of his duties. To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Richard Gutierrez was a peace officer, lawfully performing or attempting to perform his duties as a peace officer. [¶] 2. The defendant willfully resisted or delayed Richard Gutierrez in the performance or attempted performance of those duties; and [¶] 3. When the defendant acted, he knew, or reasonably should have known, that Richard Gutierrez

14.

was a peace officer performing or attempting to perform his duties. [¶]
Someone commits an act willfully when he or she does it willingly or on
purpose. It is not required that he or she intent to break the law, hurt
someone else, or gain any advantage. [¶] A person employed by the
Madera County Sheriff's Department as a deputy sheriff is a peace officer.
The duties of a deputy sheriff include investigating crimes and arresting and
detaining suspects of crimes."

The jury was further instructed with CALCRIM No. 2670, in relevant part, as follows:

"The People have the burden of proving beyond a reasonable doubt
that Richard Gutierrez was lawfully performing his duties as a peace officer.
If the People have not met this burden, you must find the defendant not
guilty of resisting, delaying, or obstructing a peace officer. [¶] A peace
officer is not lawfully performing his or her duties if he or she is unlawfully
arresting or detaining someone. [¶] A peace officer may legally arrest
someone if he or she has probable cause to make the arrest. Any other arrest
is unlawful. Probable cause exists when the facts known to the arresting
officer at the time of the arrest would persuade someone of reasonable
caution that the person to be arrested has committed a crime.… [¶] In
order for an officer to lawfully arrest someone for a felony without a
warrant, the officer must have probable cause to believe the person to be
arrested committed the felony. However, it was not required that the offense
be committed in the officer's presence. [¶] … [¶] The officer must tell the
person that the officer intends to arrest him … , why the arrest is being
made, and the authority for the arrest."

Mandujano did not object to these instructions or seek modification.

### 1. *Exigent Circumstances*

Mandujano now contends that the trial court prejudicially erred by omitting the
portion of CALCRIM No. 2670 (section B) relating to "entering a home without a
warrant," which requires probable cause and exigent circumstances. The use notes
for CALCRIM No. 2670 provide that section B be given if there is an issue as to whether
the officer had a legal basis to arrest someone. (Judicial Council of Cal. Crim. Jury
Instns. (2020), Bench Notes to CALCRIM No. 2670.) That section provides that, in order
for an officer to enter a home to arrest someone without a warrant and without consent,
the officer must have probable cause and exigent circumstances must exist. (CALCRIM
No. 2670, section B.) Here, the record does not support such instruction.

15.

A police officer may arrest a person without a warrant in a public place based on probable cause. (*U.S. v. Santana* (1976) 427 U.S. 38, 42; *People v. Hampton* (1985) 164 Cal.App.3d 27, 35.) Probable cause exists when the facts known to the arresting officer would persuade someone of " ' "reasonable caution" ' " that the person to be arrested has committed a crime. (*People v. Thompson* (2006) 38 Cal.4th 811, 818.)

However, the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a person's home to make an arrest, and such an arrest is presumptively unreasonable. (*Payton v. New York* (1980) 445 U.S. 573, 576, 586.) In order for officers to make a lawful nonconsensual entry into a home to make an arrest without a warrant requires both probable cause and exigent circumstances. (*People v. Wilkins* (1993) 14 Cal.App.4th 761, 777.) Exigent circumstances describes an emergency situation that requires swift action to prevent (1) imminent danger to life or serious damage to property, or (2) the imminent escape of a suspect or destruction of evidence. (CALCRIM No. 2670, section B.)

In *U.S. v. Santana, supra,* police received a tip that a suspected heroin dealer was holding marked money to make a heroin buy. (427 U.S. at p. 40.) Officers observed the defendant holding a paper bag while standing in the doorway of her house. The officers got out of their vehicle 15 feet from the defendant, shouted "police" and displayed identification. The defendant "retreated into the vestibule of her house." (*Ibid.*) Officers followed the defendant through the open door and caught the defendant in the vestibule, arrested her, and seized heroin marked bills. (*Ibid.*) The defendant moved to suppress the heroin and marked money.

The United States Supreme Court in *U.S. v. Santana, supra,* held that a criminal suspect standing in the doorway of her home is considered to be in a public place without any expectation of privacy and her act of retreating into her house could not thwart an otherwise proper arrest because the case involved a true "hot pursuit." (427 U.S. at p. 42.)

The Court concluded that a "suspect may not defeat an arrest which has been set in motion in a public place … by the expedient of escaping to a private place."  (*Ibid.*)

Thus, an occupant of a home who voluntarily opens the door when police knock may be arrested without a warrant if he remains in the doorway.  (See, e.g., *U.S. v. Vaneaton* (9th Cir. 1995) 49 F.3d 1423, 1425; *United States v. Botero* (9th Cir. 1978) 589 F.2d 430, 432.)  It is only when a defendant is forced from his home by "coercive police behavior" or tricked into coming to the door through police subterfuge that the defendant is involuntarily in public at the time of arrest.  (*United States v. Morgan* (6th Cir. 1984) 743 F.2d 1158, 1166; *United States v. Johnson* (9th Cir. 1980) 626 F.2d 753, 757.)

"California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense."  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217.)  "Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020.)

However, " 'A party is not entitled to an instruction on a theory for which there is no supporting evidence.' "  (*People v. Roldan* (2005) 35 Cal.4th 646, 715, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Here, there was no evidence of an unlawful arrest, and there were no disputed facts bearing on that issue. While Mandujano testified that he never left his house, he also admitted that he answered the door when Detective Gutierrez knocked, and that he remained at the door, keeping one hand on the door and the other hand on the door frame, while talking to Gutierrez.  He was therefore in a public place when arrested, even though he retreated and ran back into the house.  (*U.S. v. Santana, supra,* 427 U.S. at p. 43.)  Mandujano was therefore not entitled to instructions on exigent circumstances in relation to the lawfulness of his arrest.

17.

## 2. *Excessive Force or Self-Defense*

Mandujano also contends that the trial court prejudicially erred by not instructing the jury on officers' use of excessive or unreasonable force in arresting him or on self-defense under CALCRIM No. 2670, section D. Again, we find that the record does not support such instruction.

The subject of a peace officer's arrest may lawfully use reasonable force in self-defense when either unreasonable force is used to make the arrest, or it reasonably appears to the arrestee that unreasonable force will be used to make the arrest. (*People v. Adams* (2009) 176 Cal.App.4th 946, 953-954 (*Adams*).) As stated in *Adams*:

> " 'When a peace officer or a private citizen employs reasonable force to make an arrest, the arrestee is obliged not to resist, and has no right of self[-] defense against such force. ([Citations]; Pen. Code, § 834[a].) On the other hand, the use of unreasonable or excessive force to make an arrest constitutes a public offense. [Citation.] And all persons have a right to prevent injury to themselves by resisting a public offense (Pen. Code, § 692). Moreover, ["]a person who uses reasonable force to protect himself [...] against the use of [...] excessive force in making an arrest is not guilty of any crime.["] [Citation.] [¶] The right to resist excessive force used to make an arrest is an application of the law of self-defense.' " (*Adams, supra,* 176 Cal.App.4th at pp. 952-953.)

As noted, Mandujano did not ask the trial court to give CALCRIM No. 2670, section D, which instructs that, "If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest … a person, that person may lawfully use reasonable force to defend himself or herself." (CALCRIM No. 2670.) However, Mandujano effectively argues that the trial court had a sua sponte duty to give the instruction.

A trial court has a duty to instruct, sua sponte, "on all principles closely and openly connected with the facts of the case, and which are necessary for the jury's understanding of the case." (*People v. Boyer* (2006) 38 Cal.4th 412, 468-469.) "As to defenses, such as self-defense, the court must instruct sua sponte only if there is substantial evidence of the

18.

defense and the defense is not 'inconsistent with defendant's theory of the case.' "
(*People v. Elize* (1999) 71 Cal.App.4th 605, 615.)

Mandujano contends the force used by the officers to subdue him was excessive and justified the instruction. At trial, Mandujano testified that, after he answered the door and Gutierrez identified himself and said he wanted to ask Mandujano some questions, Gutierrez took a step forward and tried to grab Mandujano by the chest and pull him outside. Another person then grabbed Mandujano's arm and pulled him partially outside, and he then felt "two blows to the face" before landing on his knees inside the house.

Both Officers Hernandez and Adams testified that they attempted to detain Mandujano when he began to retreat into the doorway. Adams grabbed Mandujano's arm and then his shirt as Mandujano pulled away. When Mandujano clenched his fist, Hernandez struck him on the left side of the face because he was concerned Mandujano would assault one of the officers. When Mandujano's momentum carried the officers just inside the residence, both Hernandez and Adams fell to the ground with Mandujano, and Hernandez struck Mandujano a second time on the left side to gain control of him. Hernandez then flipped Mandujano over onto his stomach, secured his hands behind his back, and handcuffed him.

Here, we find no duty to give the instruction, sua sponte, because there was insufficient evidence to support it. Other that testifying as he did, Mandujano presented no claim or argument that the officers used excessive force in effecting his arrest. At no time during cross-examination of the officers did defense counsel touch on the contention that they used excessive force in arresting Mandujano. Nor did defense counsel argue in closing that the officers used unreasonable force in arresting Mandujano, saying only that Mandujano "gets punched multiple times." Nor did he argue that Mandujano had to defend himself as a result, saying only that "[h]e never swung or anything." Instead, defense counsel argued that Mandujano never resisted arrest, which was consistent with Mandujano's testimony at trial that he never resisted the officers.

Mandujano's reliance on *People v. White* (1980) 101 Cal.App.3d 161, to support a different conclusion, is misplaced. In *People v. White, supra,* the defendant proffered a combined defense of excessive force and self-defense. The testimony from the defendant, corroborated by another witness, showed the police officer started choking and beating the defendant. The trial court was aware of the defendant's reliance on self-defense as it related to the use of excessive force. In that situation, the instructions, as given, were incomplete in failing to tell the jury that if they found the arrest was made with excessive force, it was unlawful, and they should find the defendant not guilty of resisting arrest. (*Id.* at pp. 167-168.)

Here, because there was no substantial evidence of excessive force, the trial court had no duty to give the CALCRIM No. 2670, section D instruction Mandujano did not request. (See *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 760-761 [affirming trial court's refusal to instruct with CALCRIM No. 2670, explaining that a peace officer is not lawfully performing his duties if he is using excessive force in connection with charge of resisting arrest; the trial court "correctly determined that the evidence did not support the instruction requested by the defense and therefore should not be given"], disapproved on another ground in *People v. Bryant* (2021) 11 Cal.5th 976, 986, fn. 5.)

### 3. Reference Exclusively to Detective Gutierrez in Jury Instructions

Mandujano finally contends that the trial court erred by referring exclusively to Detective Gutierrez, but not to Officers Hernandez and Adams, in instructing the jury on count 3. Mandujano contends the instruction, as given, "isolated" Gutierrez's actions "in order to sanitize and legalize Hernandez's excessive force." We find no merit to Mandujano's argument.

We note that, as argued by the prosecutor, Mandujano violated section 148 when he tried to run back into the house after Detective Gutierrez attempted to arrest him outside the front door. Mandujano's interactions with Officers Hernandez and Adams did not commence until after he had already resisted being arrested by Detective Gutierrez.

Furthermore, we addressed the issue of excessive force, above, and found no merit to that argument.

## **DISPOSITION**

The judgment is affirmed.

SMITH, J.

WE CONCUR:

HILL, P. J.

DE SANTOS, J.